IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | |
| VS.                      ) | Case No. 2:11cr7-MHT |
| ) | |
| MONTY ERVIN              ) | |

**DEFENDANT MONTY ERVIN'S SENTENCING MEMORANDUM**

In determining the sentence in this case, this Court must consider the following factors: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need for deterrence; (4) the need to protect the public; (5) the need to provide the defendant with needed educational or vocational training or medical care; (6) the kinds of sentences available; (7) the Sentencing Guidelines range; (8) pertinent policy statements of the Sentencing Commission; (9) the need to avoid unwanted sentencing disparities; and (10) the need to provide restitution to victims. See 18 U.S.C. § 3553(a); United States v. Talley, 431 F.3d 784, 786 (11th Cir. 2005). This memorandum will address Sentencing Guidelines matters and the history and characteristics of the defendant.

Facts touching on the many of the factors listed above are

set forth in the Presentence Investigation Report.

## Characteristics of Monty Ervin

Monty Ervin is 61 years old. He has a lifelong connection with the Houston County, Alabama area. He has a long history of work and gainful employment. Had Monty Ervin relied upon the advice of competent tax lawyers over the years rather than the Louis Mohrs of the world, he might well now be considered one of the most successful business owners in Houston County.

## Sentencing Guidelines

### Tax Loss

Paragraph 74 of the presentence report states the tax loss to be $937,843. The tax guideline, U.S.S.G. 2T1.1, "provides sentencing standards for 'Tax Evasion; Willful Failure to File Return, Supply Information, or Pay Tax; Fraudulent or False Returns, Statements, or Other Documents.' " United States v. Gordon, 291 F.3d 181, 187 (2d Cir.2002) (quoting § 2T1.1). Pursuant to U.S.S.G. 2T1.1(a), the base offense level for tax evasion, or the payment thereof, is the level from 2T4.1 (Tax Table) corresponding to the tax loss.

At trial, the government prepared a calculations of "tax loss" based, the Government asserted, upon an application of the ordinary income tax tables to "distributions" made from Southern Realty and Property Management, LLC, to Monty and/or Patricia

2

Ervin. (Trial Transcript, Vol. V, pages 131-132, lines 19-25 and 1-8, respectively).  In the audit of Southern Realty and Property Management, LLC, Susan Tyson treated Southern Realty and Property Management as having elected 1120 status, that is, to be treated as a corporation for tax purposes.  Therefore, applying the treatment of Southern Realty as a corporation, the Government treated the money from Southern Realty as distributions to shareholders from a corporation.  With such treatment the "distributions" should have been treated as corporate dividends and therefore taxable at a capital gains rate of fifteen (15%) percent.  During cross-examination of Susan Tyson, the following occurred:

    Q.    All right. And using that period of time, and if we use it as a dividend, what would be the dividend taxation rate?

           Wouldn't it be 15 percent?

    A.    Possibly.

    Q.    Did you calculate the deficiencies that you're discussing here in this case based on a 15 percent rate on distributions?

    A.    No, sir.  (Trial Transcript, page 134, lines 1-7)

Instead Susan Tyson admitted during cross-examination that her calculations, as presented, utilized the higher ordinary income rate.  Additionally, the Government's calculations asserted a "tax loss" which bore no correlation to the use of the

3

"distributions", i.e, the Ervins were not given any credit against the distributions for purchases, in their capacities as trustees, of properties which were placed in various trusts, although the Ervins asserted that the distributions were derived from the incomes of the trusts and were intended for and did result in the purchase of additional trusts assets for the trusts.

Also at trial, although not asserting the same as evidence of tax loss, the government displayed to the jury an exhibit depicting the gross receipts of Southern Realty on behalf of the various trust.

For the purpose of determining the tax loss for sentencing the Government has now abandoned the approach taken at trial and asserts a method which would "estimate" tax loss based solely on the *gross receipts* of Southern Realty on behalf of the trusts. The defendants, on the other hand, have employed the CPA firm of Carr, Riggs & Ingram to accurately calculate the tax loss, for comparison purposes, utilizing the same approach as used by the Government at trial and applying the ordinary income tax rates, (See Exhibit A attached hereto) and have further calculated the tax loss utilizing the capital gains rate which would have been applicable to distributions from an 1120 to its shareholders. (See Exhibit B attached hereto).

In the Presentence Investigation Report, the Probation Officer recites her understanding of the Government's position stating, in part, "Revenue Agent Tyson used as gross income, the total amount of rents received by the Ervins." However, contrary to the understanding of the Probation Officer, in this instance, the term "gross receipts" would more accurately described the figure used by Revenue Agent Tyson rather than the term "gross income". As was pointed out by the Court in *United States v. Harris,* 200 Fed.Appx. 472 (6th Cir.2006, "[o]nly by subtracting expenses from gross receipts can [one] arrive at gross income".

In determining the base offense level for the Ervin's tax offenses, the Probation Office adopted the tax loss calculations of the Defendants. However, defendants contended at trial and still contend for the purposes of the sentencing hearing that, if the money in question is treated as a "distribution" from the 1120 entity, Southern Realty and Property Management, the taxes due must be calculated at the capital gains rate of fifteen percent (15%).

The Government challenges the tax loss as determined by the Defendants on two issues. First, it contends that the Net Operating Loss resulting from the Ervin's victimization at the hands of Albert Esposito's ponzi scheme should not be permitted to reduce the amount of the tax loss. And, secondly, the

5

Government attempts to add as a distribution to the Ervin's the purchase price of property placed into a trust by Anthony Ervin, the son of Monty and Patricia Ervin, although there is no evidence that the purchase price came from any distribution of money from Southern Realty.

Analysis of the plain language of the tax guideline indicates that the "tax loss" for personal income is to be calculated pursuant to § 2T1.1(c)(1)(A), which provides that:

> If the [tax] offense involved filing a tax return in which gross income was underreported, the tax loss shall be treated as equal to 28% of the unreported gross income (34% if the taxpayer is a corporation) plus 100% of any false credits claimed against tax, *unless a more accurate determination of the tax loss can be made.*

USSG § 2T1.1(c)(1)(A) (emphasis added). The tax guideline does not provide any explanation of what is meant by "a more accurate determination" nor does it indicate what data may or should be factored into <u>a more accurate determination</u>.

At least one court, however, has determined that the plain import of the clause is that a "sentencing court need not base its tax loss calculation on gross unreported income if it can make 'a more accurate determination' of the intended loss and that determination of the tax loss involves giving the defendant the benefit of legitimate but unclaimed deductions." <u>United States v. Martinez-Rios</u>, 143 F.3d 662, 671 (2d Cir.1998); <u>accord</u> <u>United States v. Gordon</u>, 291 F.3d 181, 187 (2d Cir.2002).  That

interpretation would appear to be a proper approach because the federal government cannot claim to have *lost* revenue that it never would have collected had the trusts and the Ervins properly reported and paid the taxes owed. United States v. Bishop*,* 291 F.3d 1100, 1116 (9th Cir.2002) (refusing to reduce tax loss by amount of legitimate but unclaimed deductions where defendant "did not offer such information at the time of sentencing"); United States v. Sullivan*,* 255 F.3d 1256, 1264 (10th Cir.2001) (affirming the district court's decision to use a flat percentage rate, without deductions, to calculate tax loss where the defendant had no evidence to show that he could have claimed legitimate deductions); *see also* USSG § 2T1.1 cmt. n. 1 (providing for application of a presumptive tax rate "unless the government or defense provides sufficient information for a more accurate assessment of the tax loss") (emphasis added).

Further, the Government's position with regard to the application of the "Esposito loss" differs from the testimony given by Susan Tyson on cross-examination at trial:

> Q.  If the evidence were to show that in 2005 there was a loss to the Ervins of over -- of approximately $200,000 as a result of a scam that he was pulling on them and hundreds of other *  *   *
> people, have you taken into consideration -- or should that be taken into consideration here in determining the tax as a capital loss?

7

    A.   I would consider it. (Pages 151-152, preliminary transcript, testimony of Susan Tyson)

There was no evidence presented at trial that the real property purchased in the name of the House of Israel trust was made by Monty Ervin and/or Patricia Ervin nor was there any evidence presented then or now that the money for the purchase came from distributions alleged to have been received by the Ervins from Southern Realty and Property Management, LLC. The deed of purchase indicates that the property was purchased in 2006 by Anthony Ervin as trustee for House of Israel, a trust. The document relied upon by the Government to "tie" Monty Ervin to the House of Israel trust is dated in 2009 and identifies Monty Ervin as a trustee at that time. The connection is simply too tenuous for the Government or the Court to attribute the purchase price of the property to Monty and Patricia Ervin for the purpose of calculating "distributions".

Both the defense and the Government have objected to the restitution calculations set forth in the Pre-sentence Reports. The Government, therefore, is required to present evidence of its loss. See, e.g., *United States v. Searing,* 250 F.3d 665, (8th Cir.2001) (noting the general rule that "evidence is required when the PSR's restitution calculations are objected to").

As the Government did not request a jury determination of tax loss, no findings were made at trial as to the amount of the government's alleged loss of tax revenue. Therefore, in order to award restitution this court is required to make a finding at sentencing as to the government's actual revenue loss, which require a predicate finding of the defendants' true tax liability.

At trial, the government introduced charts depicting the defendants' alleged gross receipts from the charged conspiracy. The charts were prepared by IRS Agent Susan Tyson, who testified that she had been instructed to determine the defendants' gross receipts and that, in doing so, she analyzed deposits into various bank accounts belonging to the defendants and/or Southern Realty and Property Management, LLC, considering the likely sources of the deposits and making certain adjustments. In addition, Agent Tyson reviewed the tax returns of Southern Realty and Property Management, LLC and its reported gross income, and, because its gross income represented ten percent (10%) of the gross receipts of the trust, made calculations as to the total gross receipts. Based on her analysis, Agent Tyson prepared annual summaries of the defendants' alleged gross receipts, which were reflected in the charts introduced at trial.

In its assertion that the Court should apply a percentage to the gross receipts for the purpose of calculating the tax loss, the government fails to demonstrate that it was impossible, or, for that matter, even too burdensome, to determine its actual loss. See Futrell, 209 F.3d at 1291-92 (explaining that in order to estimate a victim's loss for purposes of restitution, the court not only must have a reasonable basis upon which to approximate the loss, but it also must find that it would be impossible to determine the victim's actual loss.).

After considering the reasoned approach as taken by the defense's accountants the Court should place the tax loss at the capital gains figure found by the accountants rather than the figure as suggested by the government.

Sophisticated means

Paragraph 75 of the presentence report assigns two points for "sophisticated means."  The Commentary to U.S.S.G. 2T1.1(b)(2) states: " '[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore accounts ordinarily indicates sophisticated means."  David Johnston, a tax attorney, testified that the trusts in this case were valid

10

entities, even though they were not tax-exempt. The evidence was that the Maggie Adams I trust controlled all the other trusts set up by the Ervins. Maggie Adams I specifically conferred upon Monty Ervin authority to buy, sell, convey or take any other action with regard to the properties held by the trusts. Due to the nature of Maggie Adams I's control of the other trusts, the authority granted Monty Ervin extended to the other trusts, even though other trustees were named in those other trusts. Furthermore, David Johnston's testimony established that the trusts were not fictitious entities. Each trust was set up through trust documents which were presented as evidence [excepting those that were lost or stolen], all trusts were managed through a management company with management agreements, and the funds collected by virtue of those management agreements were not concealed. Additionally, the use of multiple legal entities in connection with the purchase, operation, and management of commercial real estate is a common method of limiting tort liability. Accordingly, Defendant Monty Ervin submits that there should be no enhancement for "sophisticated means."

<u>Organizer or Leader</u>

Paragraph 74 assigns four points for "organizer or leader" under U.S.S.G. 3B1.1(a) which states: "If the defendant was an

11

organizer or leader, manager, supervisor of one or more participants." The Commentary of U.S.S.G. 3B1.1(a) states:

> Application Notes
>
> . . .
>
> 4. In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling.  Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.  This adjustment does not apply to a defendant who merely suggests committing the offense.
>
> Background:  This section provides a range of adjustments to increase the offense level based upon the size of a criminal organization (i.e., the number of participants in the offense) and the degree to which the defendant was responsible for committing the offense.  This adjustment is included primarily because of concerns about relative responsibility.  However, it is also likely that persons who exercise a supervisory or managerial role in the commission of an offense tend to profit more from it and present a greater danger to the public and/or are more likely to recidivate.  The Commission's intent is that this adjustment should increase with both the size of the organization and the degree of the defendant's responsibility.
>
> In relatively small criminal enterprises that are not otherwise to be considered as extensive in scope or in planning or preparation, the distinction between organization and leadership, and that of management or supervision, is of less significance than in larger enterprises that tend to have clearly delineated

12

>divisions of responsibility.  This is reflected in the inclusiveness of §3B1.1(c).

In this case, Monty Ervin and Patricia Ervin ran what might literally be called a "mom and pop" business – hardly something that could be considered "extensive."  Additionally, as was pointed out by the United States Court of Appeals for the Eleventh Circuit in United States v. Yeager, 331 F.3d 1216, 1226 (11th Cir. 2002),

>When the defendant is "an organizer, leader, manager, or supervisor" in any other criminal activity (that is, any criminal activity not involving five or more participants and not extensive), then his offense level should be increased by two, Id. At (c).

Accordingly, there should not be a four level increased under U.S.S.G. 3B1.1(a).

Departures and Variances

The following specific factors are bases for a downward departure or variance:

Montyy Ervin's work history

Monty Ervin has a good work and employment history which should be considered. See Gall v. United States, 552, U.S. 38, 128 S. Ct. 586, 592, 599, 169 L.Ed.2d 804 (2007) (discussion concerning defendant's employment history and the start of his own business); United States v. Chase, 560 F. 3d 828 (8th Cir.

13

2009) (defendant's excellent employment record could support downward variance); United States v. Jones, 158 F.3d 492 (10th Cir. 1998) (3-level downward departure affirmed for defendant convicted of possessing firearm by prohibited person where court considered defendant's "long impressive work history. . .where good jobs are scarce" along with other factors).

Monty Ervin has worked hard all of his life. This factor should be taken into account along with the other information presented in the presentence report.

Monty Ervin's age and related health issues

Monty Ervin is 61 years old. He also has some health issues. According to studies, defendants over the age of 40 exhibit markedly lower rates of recidivism in comparison to younger defendants. Specifically, rates declines relatively consistently as age increases from 35.5% [under 21] to 9.5% [over 50]. Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, pp. 12, 28 (2004), located at www.ussc.gov/publicat/Recidivism.General.pdf. See, United States v. Thomas, 595 F. Supp. 2d 949 (E.D.Wis., 2009) (considering defendant's age, limited prior criminal history, and personal characteristics including time spent in the army, among other factors, district court imposed 5 months in custody and 5 months home detention with three years

14

supervised release, where Guidelines recommended 27-33 months imprisonment); United States v. Hodges, 2009 WL 366231 (E.D.N.Y., Feb. 12, 2009) (court relies in part on lower risk of recidivism for older defendants like this 43-year old defendant); United States v. Lucania, 379 F. Supp. 2d 288, 297 (E.D.N.Y. 2005) ("Post-*Booker* courts have noted that recidivism is markedly lower for older defendants."); United States v. Carmona-Rodriguez, 2005 WL 840464, * 4 (S.D.N.Y. April 11, 2005) (unpublished) (where 55-year old woman pled guilty to drug distribution, 30-month sentence (below guideline range) was appropriate due to low probability defendant would recidivate); Simon v. United States, 361 F.Supp.2d 35 (E.D.N.Y. 2005) ("Under the Guidelines, age was not normally relevant to sentencing. § 5H1.1. Post-Booker, however, at least one Court has noted that recidivism drops substantially with age.  Nellum, 2005 WL 300073 (granting non-Guideline sentence and noting that recidivism rate for defendants between the age of 41 and 50 with a criminal history category of III is less than half that of defendants under the age of 21). "The Guidelines' failure to account for this phenomenon renders it an imperfect measure of how well a sentence protects the public from further crimes" of the defendant.")  Combining his age with his health issues warrants a close look at a downward departure or variance.  See United States v. Gray, 353 F.3d 1323 (11th Cir. 2006)(upheld below

15

Guidelines sentence taking into consideration the Section 3553(a) factors which include the "history and characteristics" of the defendant – "the defendant's age [64], prior minimal record, and his medical condition.)

Monty Ervin's lack of a significant criminal history

Monty Ervin has only 1 point in the calculation of his criminal history category. That point came from a 1998 obstruction of governmental operations conviction in the District Court of Houston County. He was fined $100.00. A defendant such as Monty Ervin who has an insignificant criminal history finds more significance in any term of incarceration than a defendant who has been previously imprisoned. See United States v. Baker, 445 F.3d 987 (7th Cir. 2006)(upheld below Guidelines sentence noting as "significant … the district court's finding that a prison term would mean more to [the defendant] than a defendant who previously had been imprisoned.")

Monty Ervin has made efforts to pay restitution

Even though the Ervins dispute the amount claimed by the Government for restitution, as trustees, they have put multiple properties up for sale in order to be able to pay the entire amount owed, when a final determination of the amount is made. The trusts will take a substantial loss on the sale of those properties in the current market; however, the trusts will pay

16

the entire amount of restitution that is determined to be owed. In <u>United States v. Kim</u>, 364 F.3d 1235, 1244-1245 (11th Cir. 2004, a downward departure from 24 months to probation and home detention was deemed justified after the defendant pled guilty to conspiracy to defraud the United States, based on defendants' (husband and wife) payment of $ 280,000.00 restitution by liquidating 75% of their life savings and voluntarily undertaking enormous debt to pay restitution.  See also <u>United States v. Hairston</u>, 96 F. 3d 102, 108 (4th Cir. 1996) (restitution that cannot be characterized as typical or usual can provide a basis for a departure); <u>United States v. Oligmueller</u>, 198 F. 3d 669, 672 (8th Cir. 1999) (affirming departure on the basis of extraordinary restitution because "[w]e have previously held that cases can fall outside the heartland when there are extraordinary efforts at restitution"); <u>United States v. Curry</u>, 523 F.3d 436 (4th Cir. 2008) (judge varied five months below the guideline range for defendant's mail fraud and fraud convictions to reflect his attempted restitution).

In this case, the trusts will not only be paying a substantial amount of restitution, but will also be taking a massive loss on the properties they are selling to pay restitution.  Even if the Ervins, as trustees, cannot pay all the restitution amount owed in one single payment, a departure

17

may be warranted so that they would have the ability to work and pay all the restitution. See <u>United Stated v. Menyweather</u>, 431 F.3d 692, 702 (9th Cir. 2005) ( in case of embezzlement of $500,000, after <u>Booker</u>, no abuse for court to depart downward by 8 levels to probation in part because " a sentence of probation may have made defendant better able to provide restitution to the victims, *see* 18 U.S.C. § 3553(a)(7)"); <u>United States v. Coleman</u>, 370 F. Supp. 2d 661 (S.D. Ohio 2005) (defendant convicted of conspiracy to violate FDA Act involving misbranded drugs was sentenced to probation, community treatment center and house arrest in part because "five years of probation, as opposed to one year of imprisonment or imprisonment with supervised release, will afford defendant more time to pay restitution. 18 U.S.C. § 3553(a)); <u>United States v. Peterson</u>, 363 F. Supp. 2d 1060 (E.D.Wis. 2005) (defendant, a gambling addict in counseling, pled guilty to defrauding bank of $80,000; court imposed one day in prison and 5 year supervised release term in part so defendant would not lose job and could pay restitution).

    The Ervins managed the properties involved in these cases in such manner as to successfully generate a substantial net income.  A departure or variance would allow the Ervins to continue to manage their business and generate income to pay restitution.

Taking these factors into account, Defendant Monty Ervin submits that a sentence substantially less than the Sentencing Guidelines range would be just.

    s/ Thomas M. Goggans
    Ala.. State Bar No. 2222-S45-T
    2030 East Second Street
    Montgomery AL 36106
    PH: 334.834.2511
    FX: 334.834.2512
    e-mail: tgoggans@tgoggans.com

    One of the Attorneys for Defendant Monty Ervin

## CERTIFICATE OF SERVICE

I hereby certify that I have on this the 17th day of May, 2012 electronically filed this document with the Clerk of the Court using the CM/ECF system which will send notification to each counsel of record.

    s/ Thomas M. Goggans